UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CROWN BANK JJR HOLDING COMPANY, INC.,** | |
| *Plaintiff*, | Civil Action No. 16-8778 |
| v. | OPINION |
| **GREAT AMERICAN INSURANCE COMPANY,** | |
| *Defendant*. | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of the parties' cross Motions for Summary Judgment. ECF Nos. 62 & 63. For the reasons that follow, both motions are denied without prejudice as to Count One of the Amended Complaint, but as to Counts Two and Tree of the Amended Complaint, Plaintiff Crown Bank JJR Holding Company, Inc.'s ("Crown Bank," the "Bank," or "Plaintiff") motion is denied, and Defendant Great American Insurance Company's ("GAIC" or "Defendant") motion is granted.

**I.     UNDISPUTED FACTS[1]**

This is an insurance coverage dispute over whether a bank's loss arising from an email impersonation of a senior executive's spouse is covered by two insurance policies.

---

[1] In addition to their Local Rule 56.1 Statements, the parties submitted a joint stipulation of the material facts underlying this action. See Joint Stip. of Material Facts ("JSOMF"), ECF No. 61. This recitation is drawn from the JSMOF, unless otherwise noted.

1

On June 6, 2011, Crown Bank applied for insurance coverage from GAIC. JSOMF ¶ 10. Crown Bank sought coverage under a Financial Institution Bond[2] ("FIB") and under a Computer Crime Policy for Financial Institutions ("CCP"). Id. ¶¶ 10-11. On or about June 21, 2011, GAIC issued the two policies, for the period of June 8, 2011 to June 11, 2012. Id. ¶¶ 13-14.

Crown Bank's policies permit its customers to submit wire transfer requests via phone or email. Id. ¶ 15. A Branch Administrator or their designee must approve all telephone or email wire transfer requests. Id. When a retail customer requests a wire transfer by phone, fax or email, a Crown Bank employee must have the customer sign and return a wire transfer authorization form, and an employee must make a telephone call to the authorized signatory on the account to confirm that the signature on the form is valid. Id. Wire transfers of more than $25,000 must be approved by a Branch Manager. Id. ¶ 22. Once the employee confirms that the signature is valid, Crown Bank then follows its internal wire procedures to complete the transfer. Id. ¶ 20.

Jacinto Rodrigues is Chairman and Chief Executive Officer of Crown Bank. Id. ¶ 26. He is married to Joaquina Rodrigues (hereinafter, "Mrs. Rodrigues"), a director of Crown Bank who is also known as "Jackie." Id. The Rodrigueses have numerous personal and business accounts at Crown Bank, including accounts in the name of "Sumo Property," and the Bank has specimens of their signatures on file. Id. Under their customer agreement with Crown Bank, the Rodrigues' may submit requests to make wire transfers by phone, fax or email, and Crown Bank will verify that they have actually requested the wire transfer by calling back the telephone number that the Bank has in its records. Id. Mrs. Rodrigues regularly does business at a branch of Crown Bank at Pulaski Street in Newark, New Jersey. Id. ¶ 27. In December 2011, Mrs. Rodrigues faxed a

---

[2] A Financial Institution Bond is a form of fidelity bond governed by a standard form contract that is regularly negotiated between representatives from the insurance and banking industries. See Peter I. Broeman, An Overview of the Financial Institution Bond, Standard Form No. 24, 110 Banking L.J. 439 (1993).

request for an international wire transfer to Crown Bank, and Jorge Fernandes, the Branch Manager of the Pulaski Street Branch, assisted her in completing the transfer. Id. This transfer is not at issue here.

### A. The Fraudulent Wire Transfer Requests

Between April 3 and April 19, 2012, Crown Bank received thirteen wire transfer requests via email, purportedly from Mrs. Rodrigues, but were in fact not from her. Id. ¶¶ 28-109. Crown Bank processed twelve of them. Id. In each case, the request came from the email address "jackiiesumo@gmail.com," which is identical to Mrs. Rodrigues's actual email address, but adds a second lower case "i." Id. ¶¶ 29, 41, 49, 59, 64, 78, 90, 100.

Each transfer request followed the same pattern: the individual impersonating Mrs. Rodrigues would request a wire transfer to a bank in Singapore via email, and a Crown Bank employee, either Jorge Fernandes or Liliana Santos,[3] would request the information necessary to complete the wire transfer and then send a completed wire transfer authorization form to the person purporting to be Mrs. Rodrigues via email. Id. ¶¶ 31, 42, 49-50, 65, 80, 93, 103. This person then returned the completed form to either Fernandes or Santos, including a signature allegedly from Mrs. Rodrigues that matched the signature that Crown Bank had in its records. Id. ¶¶ 34, 43, 51, 66, 81, 94-95, 104.[4] Fernandes or Santos then printed the PDF document and confirmed the signature matched the signature in the Bank's records. Id. ¶¶ 36, 44, 52, 67, 84, 95, 105. Despite indicating on the wire transfer forms that they did so, neither Fernandes nor Santos ever made a

---

[3] Mr. Fernandes completed the first four and last two transfers, while Ms. Santos completed the fifth through tenth transfers.

[4] For the eleventh and twelfth wire transfers completed on April 19, 2012, the person purporting to be Mrs. Rodrigues did not identify which account to debit, so Fernandes used the same account as the previous transfer, and informed that person that he was using the same account. JSOMF ¶ 103.

3

telephone call to the number in their records to confirm that the request did indeed come from Mrs. Rodrigues. Id. ¶¶ 36, 44-45, 52, 67, 84, 95, 105.

For those requests that Fernandes handled himself, as Branch Manager, he approved the completed wire transfer authorization form and forwarded the information to the Bank's main accounting office, which then executed the transfer. Id. ¶¶ 38, 46-47, 54, 97, 107. For those requests handled by Santos, she emailed the wire transfer authorization forms to Maria Reis, a Crown Bank Regional Manager at their Harrison, New Jersey Branch, who approved the requests before sending them to the accounting office for execution. Id. ¶¶ 72, 85-87.

In their email message requesting the eleventh and twelfth wire transfers, the person impersonating Mrs. Rodrigues told Fernandes that those two "should be the final wires to Singapore." Id. ¶ 100. Thus, when Fernandes received an email from the same address the next day requesting three additional wire transfers to Singapore, he "placed a telephone call to Mrs. Rodrigues to confirm the wire transfer requests," and discovered the scheme. Id. ¶¶ 111-13. In total, Crown Bank sent $2,737,930 through these fraudulent wire transfer requests. Id. ¶ 119. Mrs. Rodrigues executed an affidavit of forgery for each completed wire transfer, and Crown Bank sent a notice of claim to another insurer, National Union Fire Insurance Company ("National Union"), which denied the claim under a Bankers Professional Liability Policy. Id. ¶ 120. After arbitration proceedings with National Union, Crown Bank recovered $1 million on its claim. Id. ¶ 120.

Crown Bank submitted a notice of claim to GAIC on April 25, 2012, which investigated the claim, eventually denying coverage on September 14, 2012. Id. ¶¶ 1-2. This action followed. Id. ¶ 2; Am. Compl. ¶ 43, ECF No. 31.

## II. PROCEDURAL HISTORY

Crown Bank filed this action on October 25, 2016 in New Jersey Superior Court. Notice of Removal, ECF No. 1.1. GAIC removed the case to this Court on November 18, 2016. Id. GAIC moved to dismiss the complaint on January 13, 2017, ECF No. 11, which this Court denied on June 26, 2017. ECF No. 25. Crown Bank filed the operative Amended Complaint on October 5, 2017, ECF No. 31, which GAIC answered on October 13, 2017, ECF No. 32. The Amended Complaint asserts three causes of action for breach of contract: (1) breach of the CCP, Am. Compl. ¶¶ 46-65; (2) breach of the FIB, id. ¶¶ 66-74; and (3) breach of Rider No. 6 to the FIB's coverage for Unauthorized Signatures, id. ¶¶ 75-80. Crown Bank seeks to recover the $1,737,930 of its loss remaining after the arbitration award from National Union. Id. ¶¶ 65, 74, 80. The parties cross moved for summary judgment on April 30, 2019. ECF Nos. 62, 63.

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## IV.  DISCUSSION

Crown Bank asserts three breach of contract claims, Count One, as to the CCP, Counts Two and Three as to the FIB, which the parties agree are governed by New Jersey law.[5] To prevail, Crown Bank must show "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." Hibbert v. Bellmawr Park Mut. Hous. Corp., 628 F. App'x 132, 134-35 (3d Cir. 2015) (quoting Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007)).  The Bank and GAIC agree that they entered into the two insurance contracts at issue here, and that to the extent that there was a breach, that Crown Bank has been damaged.  JSOMF ¶¶ 13-14 (entering FIB and CCP, contracts of insurance), ¶¶ 119-20 (specifying loss of $2,737,930, less $1,000,000 award under National Union policy).

In addition to disputing whether there has been a breach under the two insurance policies, the parties also dispute the cause of the loss.  GAIC maintains that Crown Bank's failure to follow its procedures by making a telephone call back to the accountholder was the cause of the loss, precluding coverage.  GAIC Mem. at 16-19, ECF No. 63.1.  Crown Bank contends that its loss was caused by the receipt of fraudulent wire transfer forms, and is therefore entitled to coverage. Crown Bank Mem. at 11, ECF No. 62.  GAIC also contends that the Bank is precluded by its arbitration award from asserting a different theory of causation here.  Id. at 21-23.

The Court need not reach the issue of causation or its preclusion on Counts Two and Three because the Bank has failed to show that the plain language of the policies would cover the loss.

---

[5] Neither party addresses which state's law should govern this dispute, but both parties cite to New Jersey cases in their briefs, all relevant actions took place in New Jersey, and the action seeks coverage for insurance losses in this state.  Crown Bank Mem. at 10, ECF No. 62; GAIC Mem. at 20.

"New Jersey law treats insurance policies as contracts, and interprets policies by first giving effect to the plain and ordinary meaning of words therein." Tucci v. Hartford Fin. Servs. Grp., 507 F. App'x 211, 214 (3d Cir. 2012) (citing Zacarias v. Allstate Ins. Co., 168 N.J. 590 (2001)). Absent any ambiguity, the Court will apply plain meaning of the words in the contract. Where a contract of insurance contains an ambiguity, the policy should be "liberally construed in favor of the insured and strictly construed against the insurer." Arcelormittal Plate, LLC v. Joule Tech. Servs., Inc., 558 F. App'x. 205, 209 (3d Cir. 2014) (quoting Shotmeyer v. N.J. Realty Title Ins. Co., 195 N.J. 72 (2008)). Ambiguities are construed in favor of the insured in order to protect the reasonable expectations of the insured. Id.; see also Atain Specialty Ins. Co. v. Lusa Constr., Inc., No. 14-4356, 2016 WL 3452750, at *2 (D.N.J. June 21, 2016).

**A.     The FIB**

Crown Bank argues that its loss is covered by the FIB, an insurance policy GAIC issued to the Bank. For the reasons stated below, the Bank has failed to demonstrate that the terms of the FIB or Rider No. 6 apply to the loss.

**1.     Insuring Agreement (D)—Forgery or Alteration**

Crown Bank argues that Insuring Agreement D of the FIB covers its loss. This covers:

(D) Loss resulting directly from the Insured having, in good faith, paid or transferred any Property in reliance on any Written, Original
 . . .
(4) Withdrawal Order
 . . .
(6) Instruction or advice purportedly signed by a customer of the Insured or by a banking institution
 . . .
which (a) bears a handwritten signature of any maker, drawer or endorser which is Forgery; or (b) is altered, but only to the extent the Forgery or alternation causes the loss.

Actual physical possession of the items listed in (1) through (6) above by the Insured is a condition precedent to the Insured's having relied on the items.

7

FIB § (D), JSOMF Ex. 3. The FIB's definition section defines the terms "Written" and "Original" as:

> **(q) Original** means the first rendering or archetype and does not include photocopies or electronic transmissions, even if received and printed.
> . . .
> **(v) Written** means expressed through letters or marks placed upon paper and visible to the eye.

FIB Conditions and Limitations, Definitions § 1. The parties do not dispute that the wire transfer forms bearing a forged signature of Mrs. Rodrigues qualify as either Withdrawal Orders or instructions from a customer of Crown Bank, triggering coverage if the loss resulted directly from Crown Bank's good faith payment of them. Rather, the parties dispute whether Crown Bank ever had actual, physical possession of the "Written, Original" wire transfer forms, as required by the final sentence of Insuring Agreement D quoted above. GAIC Mem. at 24.

Here, each wire transfer request came to the bank via email, a form of electronic transmission. As the definition above makes clear, "Originals" do not include electronic transmissions. While the Bank correctly argues that a PDF itself is not itself an electronic transmission, but rather a file format, this argument ignores the fact that PDFs can be transmitted electronically, and they were here. The parties concede as much. GAIC Resp. to Crown Bank's SOMF ¶ 6, ECF No. 68.1.

Crown Bank makes two attempts to argue around this plain language. First, it contends that when its employees printed the wire transfer forms, that the printed document should be considered a "Written, Original." Crown Bank Mem. at 33. This is simply contrary to the express language of the FIB, which states that documents transmitted electronically are not originals, "even if received and printed." FIB Conditions and Limitations, Definitions § 1(q).

The Bank next argues that a PDF could be considered a "first rendering or archetype" within the meaning of the FIB's definition of Original, thus that the term "Original" is ambiguous as applied to a PDF, and that the ambiguity should be construed in its favor to protect its reasonable expectations as the insured. Crown Bank Mem. at 34. Again, this argument flies in the face of the plain language of the definition of "Original," which excludes documents transmitted electronically. Regardless of any ambiguity concerning whether a PDF may qualify as an "Original" without an electronic transmission, where a PDF (or any electronic file format) is transmitted electronically, it cannot qualify as an "Original" as defined in the FIB.

This interpretation is consistent with other courts' construction of similar language. In Valley Community Bank v. Progressive Casualty Insurance Co., a bank sought coverage under an identically worded insurance policy for a loss it sustained when it made loans in reliance on certain financial statements that it received via PDF. 854 F. Supp. 2d 697, 706 (N.D. Cal. 2012). Before making the loan in that case, the bank had required the fraudster to submit statements, purportedly from his investment account, to corroborate his assets. Id. at 702. In fact, the fraudster submitted statements from an investment account belonging to a third party that he altered to bear his name. Id. In seeking coverage under an identically worded insuring agreement, that bank argued that the PDF statements were in fact the originals, as the fraudster had altered the electronic files. Id. at 706. The court denied coverage, holding that as the PDFs were forwarded to the bank, they were transmitted electronically, and therefore could not qualify as "Originals" under that policy.[6]

---

[6] Crown Bank argues that Bank of Ann Arbor v. Everest National Insurance Co., No. 12-11251, 2013 WL 665067, at *1 (E.D. Mich. Feb. 25, 2013) "found that a fax constituted an 'Original.'" Crown Bank Mem. at 34. This presentation is misleading. While the District Court in that case granted summary judgment in favor of the bank on its claim for coverage based on a faxed withdrawal order, the insurance company did not raise the argument that the bank did not possess the original. The insurer in that action then sought reconsideration on the ground that the bank did not have possession of the original document, which the District Court denied as not raised on the initial motion for summary judgment. 2013 WL 1914232, at *2 (E.D. Mich. May 8, 2013). The Court of Appeals then affirmed that denial of reconsideration. 563 F. App'x 473, 477 (6th Cir. 2014). Contrary to Crown Bank's argument, no court at any stage of the proceedings in that case found that a fax constituted an "Original" document under the language of the FIB.

9

Because Crown Bank cannot show that it is in possession of a Written, Original of the wire transfer forms, it cannot meet Insuring Agreement (D)'s condition precedent of coverage. The Bank's Motion for Summary Judgment on this count is denied. Similarly, as GAIC has demonstrated that the Bank does not dispute that it does not have possession of any instruments other than the electronic or printed PDFs of the wire transfer forms, it is not entitled to coverage under FIB Insuring Agreement (D) as it has failed to meet the condition precedent of coverage. GAIC's Motion for Summary Judgment on Count Two of the Amended Complaint is granted, and correspondingly, Crown Bank's motion is denied.

### 2. FIB Rider No. 6—Unauthorized Signatures

Crown Bank next argues that it is entitled to coverage under Rider No. 6 to the FIB, which provides additional coverage under Insuring Agreement (D). The Court disagrees.

Rider No. 6, titled "UNAUTHORIZED SIGNATURES" amends the FIB:

by adding as an additional paragraph to Insuring Clause (D), forgery or alteration, the following:

Loss resulting directly from the Insured having accepted, paid or cashed any check or withdrawal order made or drawn on a customer's account which bears the signature or endorsement of one other than the person whose name and signature is on file with the Insured as a signatory on such account, shall be deemed to be a Forgery under this Insuring Clause. It shall be a condition precedent to the Insured's right of recovery under this Coverage that the Insured shall have on the file signature of all persons who are signatories on such account.

FIB Rider No. 6 § 1, JSOMF Ex. 3. The Bank argues that Rider No. 6 covers the loss here because Mrs. Rodrigues executed an affidavit of forgery stating that she did not sign any of the wire transfer forms. Therefore, it contends, "the signature on the Forged Wire Forms was of someone other than Mrs. Rodrigues's 'whose name and signature is on file'" with the Bank, triggering coverage. Crown Bank Mem. at 30; JSOMF Ex. 33.

10

This argument confuses both the record on the present motion and the plain text of the rider. There is no coverage for the bank's loss here as they have repeatedly conceded that each of the wire transfer forms bore "Mrs. Rodrigues's signature." JSMOF ¶¶ 34, 43, 51, 66, 81, 94, 104. As Mrs. Rodrigues is an authorized signatory, this loss is squarely outside the plain text of the Rider.

While this would be sufficient to deny the Bank's motion for summary judgment, the Bank's interpretation is also inconsistent with the remainder of the FIB. Under the law of New Jersey, this Rider must be interpreted consistently with the entire insurance policy. Formosa Plastics Corp., U.S.A. v. Ace Am. Ins. Co., No. 06-5055, 2010 WL 4687835, at *6 (D.N.J. Nov. 9, 2010) ("[p]olicy terms are properly considered in the context that they appear, when viewed against the policy as a whole"). By its terms, Rider No. 6 amends Insuring Agreement (D), Forgery or Alteration, and Section 3 of the Rider states that "[n]othing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned bond, other than as stated herein." FIB Rider No. 6 § 3. Even assuming arguendo that Rider No. 6 applies to the signatures on the wire transfer forms, the rider deems the unauthorized signatures to be forgeries by amending Insuring Agreement (D). Id. § 1. As discussed above, Insuring Agreement (D) requires that the Bank have possession of a Written, Original document as a condition precedent of coverage. Because the Rider's plain text states that it does not vary any term or limitation of the FIB, it has no effect on the requirement that the Bank retain possession of a Written, Original document before seeking coverage under Insuring Agreement (D). For the reasons stated in Section IV.A.1, supra, the Bank does not have possession of a Written, Original of the wire transfer forms, and therefore there is no coverage even under its own interpretation of the Rider.

Finally, the Rider's text also makes clear that it does not apply to forged signatures. The Rider operates by "deem[ing]" unauthorized signatures "to be a Forgery" under Insuring Agreement (D) FIB Rider No. 6 § 1. Under the Bank's reading, the Rider would therefore deem forged signatures, like those at issue here, to be forgeries. This is a facially implausible construction.

### B. The Computer Crime Policy

Plaintiffs also argue that they are entitled to coverage under the CCP. The CCP is an insurance policy GAIC issued to Crown Bank. It contains a number of separate insuring agreements, but Crown Bank only seeks coverage under the first one, the Computer Systems Fraud Insuring Agreement ("CSFIA"), which covers:

Loss resulting directly from a fraudulent

(1) entry of Electronic Data or Computer Program into, or

(2) change of Electronic Data or Computer Program within

> any Computer System operated by the Insured, whether owned or leased; or any Computer System identified in the application for this policy; or a Computer System first used by the insured during the policy period, as provided by General Agreement A;

provided the entry or change causes
. . .
(ii) an account of the Insured, or of its customer, to be added, deleted, debited or credited, or

. . .
In this Insuring Agreement, Fraudulent Entry or change shall include such entry or change made by an employee of the Insured acting in good faith

. . .

(b) on an instruction transmitted by Tested telex or similar means of Tested communication identified in the application for this policy purportedly sent by a customer, financial institution or automated clearing house.

12

CCP Insuring Agreements § 1, ECF No. 61.4. Crown Bank only seeks coverage under subsection (b) of the CSFIA. The CCP's defines "Tested" as:

> a method of authenticating the contents of a communication by placing a valid test key on it which has been agreed upon by the Insured and a customer, automated clearing house, or another financial institution for the purpose of protecting the integrity of the communication in the ordinary course of business.

Id. Conditions and Limitations § 1. The Bank argues that the policy is ambiguous and therefore should afford coverage, but does not offer its own construction of the CCP that would afford coverage. Crown Bank Mem. at 26-28. Neither party addresses the relevant standard for interpreting the CSFIA. "New Jersey courts . . . 'endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured.'" Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231, 236 (3d Cir. 2006). Neither party addresses what Crown Bank's objectively reasonable expectations were in the context of the CSFIA, and how that would affect the Court's coverage determination. The record on the present motions for summary judgment is insufficient to determine the extent of coverage, and both motions are denied, without prejudice, and will direct the parties to submit further briefing on this issue, on an expedited basis.

V. **CONCLUSION**

For the reasons stated above, the parties' Motions for Summary Judgment are **DENIED WITHOUT PREJUDCE** as to Count One of the Amended Complaint. GAIC's Motion for Summary Judgment is **GRANTED** as to Counts Two and Three of the Amended Complaint, and correspondingly, Crown Bank's Motion for Summary Judgment is **DENIED** as to these counts. An appropriate order follows.

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**United States District Judge**
